**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 25-14060-CR-CANNON/MAYNARD**

**UNITED STATES OF AMERICA,**

**v.**

**SAMTANNA R. BURGESS,**

   **Defendant.**
_____/

**REPORT AND RECOMMENDATION ON**
**DEFENDANT'S MOTION TO SUPPRESS [DE 20]**

Defendant Samtanna R. Burgess ("Defendant") stands charged by indictment with possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). DE 3. In connection with this charge, Defendant has filed a motion to suppress all physical evidence seized and his statements made during the warrantless search of his person and car incident to a traffic stop while he was parked in front of his home. DE 20, DE 25. The Government opposes the motion. DE 23. The motion is referred to me for a report and recommendation. DE 21.

Upon careful review and for the following reasons, I find that the traffic stop and search of Defendant was valid under governing Fourth and Fifth Amendment jurisprudence, however the search of his car was not. I thus respectfully recommend that the motion be **GRANTED IN PART AND DENIED IN PART**.

**EVIDENTIARY HEARING**

I held an evidentiary hearing on January 28, 2026.[1]  The Government presented the testimony of one witness: Deputy John Donnelly ("Deputy Donnelly").[2]  The Government also introduced the following six exhibits relating to the challenged searches: Deputy Donnelly's body camera video footage (Govt. Ex. 1); body camera screen captures (Govt. Exs. 2 and 4); a copy of Defendant's Florida driver's license (Govt. Ex. 3); K-9 Officer Sean Patriani's body camera video footage (Govt. Ex. 5); and a photo of a firearm magazine recovered during the search of Defendant's car (Govt. Ex. 6).

Defendant offered the following eight exhibits: a map of the general area (Def. Ex. A); body camera screen captures (Def. Exs. B, C, E, and F); body camera video footage of three on-scene officers (Def. Ex. G); and utility bills (Govt. Ex. H).  Additionally, the parties stipulated that, if called by the defense, Vincent Marcellino would testify that he currently owns 1401 G Terrace in Ft. Pierce and has owned the property for approximately ten years; he previously rented Unit B of the property to Defendant for approximately one year; Defendant was renting the unit at the time of the search in March 2025; and Defendant had the utilities for that unit in his name at that time.

**FINDINGS OF FACT**

The following factual findings are based on the evidence and witness testimony presented at the evidentiary hearing.  My factual findings are based, in part, on credibility determinations, after observing all the witness testimony together with the other evidence presented.  Unless

---

[1] The court reporter has provided a final transcript from this hearing.  In this report, I cite to this hearing transcript as "Tr. __".

[2] While this witness is currently employed as a deputy with the Martin County Sheriff's Office, he was serving as an officer with the Fort Pierce Police Department at the time of the events at issue.  For consistency, this Report refers to him by his current title, Deputy Donnelly.

otherwise noted, I find that all the witnesses testified credibly. *See U.S. v. Menendez*, 2000 WL 36733765, at *1 (S.D. Fla. Oct. 2, 2000) ("Rulings on motions to suppress involve mixed question of law and fact … [One] issue of fact … [is] the credibility of the witnesses.").

On March 7, 2025, Deputy Donnelly, then assigned to the Fort Pierce Police Department ("FPPD"), was patrolling with FPPD Detectives John Ward and David Teitelbaum in an unmarked police vehicle. Tr. at 7-9, 34-35, 78. The officers were part of FPPD's Crime Suppression Unit, which focuses on dealing with narcotics, firearms, and prostitution to reduce the amount of crime in Fort Pierce. Tr. at 32. These three officers were around North 13th Street[3] and Avenue G—a location Deputy Donnelly described as high-crime with drug trafficking and firearm offenses— when they observed a blue Nissan with dark tinted windows drive directly in front of them, which they believed to be unlawful under Florida's tinting laws. *Id.* at 7-11, 35-39. Deputy Donnelly testified that he could not see through the tint to identify if there were any occupants and said he did not know the Nissan was tied to Defendant until the officers later approached the car. *Id.* at 78-80. However, he also testified that the Nissan was a distinctive color, that Defendant was the only individual he had observed driving it in the area during his patrol, and that he and his fellow officers knew Defendant was a convicted felon. *Id.* at 15-16, 80-81, 86.

As the officers attempted to initiate a roadside traffic stop, another vehicle ahead impeded them by driving too slowly, and Defendant had parked his car in front of his home located at 1401 G Terrace before the officers activated their lights. *Id.* at 11, 41, 78-79. As the officers approached the parked car, Deputy Donnelly activated his body camera. *Id.* at 34-35, 79; Govt. Ex. 1. Defendant's car was parked across a paved walkway leading to the front door of the multi-family

---

[3] At the outset of his testimony, Deputy Donnelly testified that his police report contained a scrivener's error in that it listed this location as South 13th Street, when the correct location was North 13th Street. Tr. 6.

home.  Tr. at 11.  It was parked facing away from Defendant's home pointed diagonally towards the street.  *Id.* at 11-12.  Deputy Donnelly described the car as positioned one to two feet from the street, partly on the walkway, and mostly on the grass of the unfenced front yard—closer to the street than the home.  *Id.* at 11-13.  The following photo from police body camera footage visually shows how Defendant's car was parked as the officers approached:



Govt. Ex. 2.

Upon approaching the car, the driver's side door was open and Defendant was in the driver's seat.  Tr. at 44-45.  It was then that Deputy Donnelly says he first recognized the driver as Defendant from prior photos, and he knew Defendant was a convicted felon.  Tr. at 15-16.  Deputy Donnelly identified himself as being with the police department and advised Defendant "your tint appears to be too dark and we're going to test that."  Govt. Ex. 1 at :32-:42.  Deputy Donnelly then obtained Defendant's driver's license reflecting a Port St. Lucie address.  Tr. at 16-17; Govt. Ex. 3.

Deputy Donnelly proceeded to conduct a tint test on the front driver's window, which was captured on his body camera footage, and the testing device showed an unlawful tint percentage of 5% light transmission.  Tr. at 19, 21; Govt. Exs. 1 and 4.  As he was testing the front window, Deputy Donnelly asked Defendant to roll down his back window.  Tr. at 16, 20-21; Govt. Ex. 1 at

2:08-2:16.  Defendant responded by saying he was trying to figure out what was going on, to which one officer said it was a traffic stop and commented: "I can't even see into the window bro."  Govt. Ex. 1 at 2:12-2:25.  At the hearing, Deputy Donnelly described Defendant's behavior as "very argumentative," evasive, abnormal for a traffic stop, and "extremely suspicious."  Tr. at 18-19, 22-23.  Body camera footage reveals though that Defendant appeared mostly calm, collected, and compliant with officer instructions throughout the encounter, and he appears primarily concerned with why he was being stopped since he was parked right in front of his home.  Govt. Ex. 1 at :43-:58, 2:13-3:04.

Though Defendant mostly complied, it is true that he did not comply with Deputy Donnelly's initial request, repeated later by another officer, for him to roll down his rear windows.  Tr. at 21, 25; Govt. Ex. 1 at 2:08-2:16, 2:55-3:05.  Deputy Donnelly testified that based on Defendant's behavior in a high-crime area and his knowledge of Defendant's felony status, he ordered Defendant to exit the vehicle for officer safety.  Tr. at 23-24; Govt. Ex. 1 at 3:10-3:18.  After briefly protesting, Defendant complied.  Tr. at 24.  Deputy Donnelly asked if Defendant had any weapons, to which Defendant immediately replied: "yes sir."  *Id.* at 25, Govt. Ex. 1 at 3:15-3:25.  Detective Teitelbaum removed a firearm from Defendant's front right hip area, and Defendant was patted down and placed in handcuffs.  Tr. at 25-27, 58-59.  Deputy Donnelly advised Defendant that he was detained but not under arrest at that time, with approximately three minutes elapsing from initial contact to handcuffing and approximately ten seconds elapsing from Defendant's exit from the car and discovery of the firearm.  *Id.* at 26; Govt. Ex. 1 at :29-3:46, 3:15-3:25.

Detective Ward thereafter administered *Miranda* warnings.  Tr. at 26-27.  While Detective Ward was reading Defendant his *Miranda* warnings well away from the car and while Defendant

was in handcuffs, K-9 Officer Patriani arrived on-scene and conducted a free-air K-9 sniff of the car, which lasted less than thirty seconds. *Id.* at 27; Govt. Ex. 5 at 1:38-2:20. Officer Patriana said aloud "you are good"—which Deputy Donnelly said he understood to mean a positive alert to narcotics, leading to a search of the Nissan that yielded a firearm magazine in the center console and marijuana, documented in photographs. Tr. at 27-28; Govt. Ex. 5 at 2:17; Govt. Ex. 6.

On cross-examination and in response to my questioning, Deputy Donnelly said he initially could not see through the tint to identify occupants, did not run the tag or know the car was tied to Defendant until approach, momentarily lost sight of the car at one point, and activated his body camera only upon exiting his car, not during the initial following. Tr. at 35-36, 41, 80. He also conceded that he did not personally observe the K-9's specific alert behavior. *Id.* at 59-60. He explained that he had no way to print out or give Defendant a citation on the tint violation and he never requested for a fellow officer to come print one, but he believes he issued a traffic warning citation to Defendant off camera. Tr. at 52-54, 82-83. There is no evidence of any written traffic citation ever being issued.

## ANALYSIS

Defendant raises four core arguments for suppression. First, he argues that the traffic stop was invalid because the officers lacked probable cause to make the stop in the first place. Second, he argues that the ensuing warrantless search and seizure of his person was invalid because he was within the protected curtilage of his home when officers approached, searched, and arrested him. Third, he argues that his car was impermissibly held to obtain a K-9 sniff leading to an unlawful warrantless search. Lastly, he argues his statements to police should be suppressed because the officers' questioning violated the Fifth Amendment. I will consider each argument in turn below.

**1.      The Traffic Stop Was Lawful**

First, Defendant argues that the traffic stop was unlawful because the officers targeted Defendant's car without reasonable suspicion or probable cause to stop the car.  I disagree.

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause.'" *United States v. Batson*, 749 F. App'x 804, 806 (11th Cir. 2018) (quoting U.S. Const. amend. IV).  "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *see also Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) (affirming that "the ultimate touchstone of the Fourth Amendment is reasonableness").

A traffic stop is a seizure within the meaning of the Fourth Amendment.  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  However, a traffic stop is constitutional if it is supported by probable cause to believe a traffic violation has occurred or a reasonable, articulable suspicion that criminal activity is afoot.  *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008); *see also United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999).  Probable cause exists when, under the totality of the circumstances, there is a fair probability that illegal conduct has occurred.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986).  The probable cause standard is objective, and the officers' subjective motives in executing a traffic stop are irrelevant.  *Whren v. U.S.*, 517 U.S. 806, 813 (1996); *see also Simmons*, 172 F.3d at 775.  Whether probable cause exists is "viewed from the standpoint of an objectively reasonable police officer[.]" *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003).

In Florida, driving a car with illegal tints is a traffic violation that provides a valid legal basis for a traffic stop. *United States v. Pierre*, 825 F.3d 1183, 1192 (11th Cir. 2016) (citing Fla. Stat. § 316.2953); *see also State v. Moore*, 791 So.2d 1246, 1249 (Fla. 1st DCA 2001) (determining that probable cause of a window-tint violation provided a basis for stopping a vehicle). Florida law prohibits driving cars with front or side windows that are treated with "any sunscreening material or other product or covering which has the effect of making the window nontransparent or which would alter the window's color, increase its reflectivity, or reduce its light transmittance" below the statutorily permitted level of "light transmittance of at least 28 percent in the visible light range." *United States v. Weaver*, 145 F. App'x 639, 641 (11th Cir. 2005) (quoting Fla. Stat. § 316.2953).

Here, Deputy Donnelly testified that Defendant's car passed perpendicular to the unmarked police patrol unit by traveling southbound on 13th Street while the unit was facing eastbound. Tr. 34. As the vehicle passed in front of the officers, Deputy Donnelly testified that he and his fellow officers could not see through the side windows to identify its occupants or objects due to the dark tint. *Id.* at 8-9, 34. Deputy Donnelly further testified that he has made tint traffic infraction stops before, was trained to use a tint meter, and is familiar with legal and illegal tints based on his police training and experience. *Id.* at 8.

I credit Deputy Donnelly's testimony that he observed dark window tint that he believed to be unlawful based on his experience and find that this testimony, together with other consistent objective evidence discussed below, is sufficient to establish probable cause for the stop. I do not, however, credit the testimony that Deputy Donnelly was unaware the car was associated with Defendant. Deputy Donnelly acknowledged that the car was a distinct color, that he had previously observed only Defendant driving it in that area, and that he knew Defendant was a convicted felon.

He initially testified that he knew the car was registered to Defendant based on the car's external features.  Tr. 10.  He subsequently testified that he did not know the vehicle was connected to Defendant until he got out of his own vehicle and approached Defendant.  *Id.* at 79-80.  He then admitted that he "had an idea" it was the Defendant in the car but he was not 100%.  *Id*. at 81.  Directly after that, however, he said when he exited his car and approached the Defendant, he had no belief in his head that it was Defendant.  *Id.*

Considering Deputy Donnelly's overall testimony, I find it unlikely that Deputy Donnelly did not recognize the car as one connected to Defendant at the time the officers decided to make the stop.  This credibility finding does not alter the ultimate legal analysis, however, because an officer's subjective motivations or intentions are not part of the relevant probable cause inquiry.  *See Whren*, 517 U.S. at 813.  The question is whether, viewed objectively, the facts known to the officer at the time of the stop provided a lawful basis for it.  Here, the testimony regarding the window tint establishes such a basis, regardless of any additional, unarticulated motives the officer might have had.

This is especially true here where the testimony about the window tint is consistent with and supported by the later window tint testing performed on the driver's side window, which measured five percent light transmittance—well outside the legal limit for side windows under Florida Statute § 316.2953.  This objective testing confirms that the officers' observations were accurate.  Additionally, my independent review of the body-worn camera footage and still images from that footage (including the photograph inserted above) shows that the car's side windows were obviously and significantly dark, making it reasonable for the officers to believe the car was in violation of Florida's window tint statute at the time of the stop.

Based on the officers' observation of dark window tint, the confirmed tint readings, and the body-camera footage and photographs, I find that the officers had probable cause to conduct the traffic stop. This finding is consistent with other similar cases where courts have found probable cause for a window tint violation and subsequent traffic stop. *See Weaver*, Fed. App'x at 642 (affirming finding of probable cause to stop a defendant under Florida's window tint statute based on officer's observation that his headlights reflected off the defendant's car, and he "could not see the dashboard lights or driver's silhouette through the windows at close range"); *see U.S. v. Jackson*, 558 F. App'x 932, 934 (11th Cir. 2014) (finding it inconsequential "that the record lacks evidence showing the windows of the car Jackson was riding in actually violated the window tint statute. Probable cause is determined by officer's knowledge at the time of the stop, and the record states that an officer observed a car with heavily tinted windows"); *United States v. Hooks*, 2023 WL 8239261, at *4 (S.D. Fla. Oct. 3, 2023) (finding a traffic stop lawful and supported by probable cause where officers reasonably believed that the tint on a vehicle's front windshield violated Florida law), *report and recommendation adopted*, 2023 WL 8235101 (S.D. Fla. Nov. 28, 2023); *United States v. Gonzalez*, 2009 WL 3230787, at *7 (M.D. Fla. Oct. 2, 2009) (finding that the confirmed tint violation "demonstrates that [officer] had probable cause based upon his observation to believe the Defendant's tinting was" illegal under Florida law).

### 2.  Officer Search of Defendant Was Lawful

Next, Defendant argues that the traffic stop was unlawful because his car was parked within the curtilage of his home when officers approached. Defendant also argues that the officers unlawfully seized and searched Defendant during the traffic stop. I disagree.

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). Moreover, the curtilage, defined

as "the area 'immediately surrounding and associated with the home,' " is itself " 'part of the home ... for Fourth Amendment purposes' " and is entitled to the same protection against unreasonable search and seizure as the home itself. *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1983)).

The Eleventh Circuit considers four factors set forth in the Supreme Court case *United States v. Dunn,* 480 U.S. 294, 301 (1987), to determine if an area is curtilage in the context of a warrantless search and seizure. *United States v. Stephen*, 823 F. App'x 751, 754 (11th Cir. 2020) (quoting *Dunn*, 480 U.S. at 301). The four factors are: (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.* These *Dunn* "factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the house itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Jennings*, 2021 WL 5235292, at *2 (S.D. Fla. Nov. 10, 2021) (quoting *Dunn*, 480 U.S. at 301).

Applying the *Dunn* factors here, the balance weighs against a finding of curtilage. First, the evidence shows that Defendant's car was positioned closer to the street than to the home itself, placing it at the outer edge of the property rather than in an area intimately tied to the home. Second, the area was not fully enclosed. Although there were some pieces of wood along one side of the yard near where Defendant was parked during the traffic stop, this was a low-profile demarcation or partial enclosure rather than a fence or barrier that fully enclosed or shielded the front yard space. Third, there is no evidence that the area was used for private, intimate activities associated with the home. Instead, the area appears as an open front-yard area readily accessible

and viewable from the public street with no signs of private use tied to the home. *Dunn*, 480 U.S. at 302–03 (finding it "especially significant" that the barn, used for storing chemicals, was not being used "for intimate activities of the home"). Fourth, there is no sign of steps taken to protect the area from observation by the public. The area in question was plainly visible from the roadway, with no fencing (other than the low-profile wooden demarcation line along one side of the yard) or full enclosure, screening, or other privacy measures.[4] Under these circumstances, the area where Defendant's car was parked during the traffic stop does not qualify as curtilage. *See Dunn*, 480 U.S. at 301; *see also Cowart v. Enrique*, 311 F. App'x 210, 214 (11th Cir. 2009) (applying *Dunn* factors and finding that front yard enclosed by simple wooden, two-rail fence was not within protected curtilage because the yard was easily visible from a public street and sidewalk such that the arrestee "was not entitled to Fourth Amendment protection while standing in his driveway or front yard"); *United States v. Taylor*, 458 F.3d 1201, 1207-08 (11th Cir. 2006) (affirming denial of motion to suppress and finding that pond area located on rural five-acre property was not curtilage where it was within an outer perimeter fence but was visible from the road, was situated 60 yards beyond the home, and constituted "an unoccupied and undeveloped area" outside the domestic establishment in an area where the defendant could not reasonably expect privacy); *Jennings*, 2021 WL 5235292, at *8 (finding that the end of a driveway across a sidewalk and beyond the fenced-in front yard was not in an area intimately linked to the home and was therefore not protected curtilage rendering the defendant's arrest and subsequent search reasonable). Accordingly, Defendant's curtilage argument fails.

---

[4] I note, as an observation rather than a basis for my recommended ruling, that the curtilage inquiry may at times operate unevenly across different residential neighborhoods. The *Dunn* factors focus in part on physical enclosures, barriers, and other indicia of privacy, which are more commonly present in certain neighborhoods than others. In areas where homes lack fences, garages, or other structures that signal privacy, residents may have fewer outward markers of curtilage despite having the same expectation of privacy as others. That broader concern, however, does not alter my obligation to apply the governing legal precedent to the specific facts of this case.

Because the stop itself was lawful and Defendant was not on protected curtilage, the officers were permitted to order Defendant to exit the car as a routine safety measure. Under controlling Supreme Court precedent, applied in the Eleventh Circuit, officers may order a driver out of a car as a matter of course during a lawful traffic stop without any additional justification. *See Maryland v. Wilson*, 519 U.S. 408, 410 (1997) ("[A] police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle"); *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 n.6 (1977) (holding that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures"); *U.S. v. Brooks*, 448 Fed. Appx. 27, 29 (11th Cir. 2011). Furthermore, an officer may conduct a limited search of an occupant's outer clothing for weapons if he or she has reasonable suspicion that the person may be armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 327 (2009); *United States v. Bishop*, 940 F.3d 1242, 1248 (11th Cir. 2019). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

Here, the officers lawfully ordered Defendant to exit his car. Their knowledge that Defendant was a convicted felon was not required to justify their order for him to exit the car. Within less than ten seconds of Defendant exiting the car, he readily admitted to having the firearm which officers immediately removed from his right hip area. On these facts, the officers acted within the bounds of the Fourth Amendment and suppression of the firearm is not warranted.

### 3.   K-9 Sniff Was Permissible, However a Reliable Alert Was Not Proven

Next, Defendant argues that the officers impermissibly held his car to obtain a K-9 sniff and there was no communication of any alert as part of the search of the car.  While I find that the K-9 sniff itself was permissible, I also find that there is no proof of a valid alert.

A K-9 free-air sniff conducted during a lawful traffic stop is permissible so long as it does not prolong the stop beyond the time reasonably required to complete the traffic-related mission. *Rodriguez v. United States*, 575 U.S. 348 (2015); *United States v. Campbell*, 26 F.4th 860 (11th Cir. 2022).  In the context of a traffic stop, "the tolerable duration of police inquiries ... is determined by the seizure's mission[.]" *Rodriguez*, 575 U.S. at 354.  The mission of a traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns[.]" *Id*.  And the stop may "last no longer than is necessary" to complete its mission. *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  In other words, "[a]uthority for the seizure ... ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

That a K-9 sniff itself is justified during a traffic stop does not automatically mean that an ensuing warrantless search is constitutional.  Probable cause is still required.  Probable cause to search a vehicle exists when a narcotics-trained dog alerts to the presence of drugs in the vehicle. *U.S. v. Dunkley*, 911 F.2d 522, 527 (11th Cir. 1990); *see also Braddy*, 11 F.4th at 1312.  The Supreme Court has rejected a "strict evidentiary checklist" for assessing a K-9's reliability.  *Harris*, 568 U.S. at 244-45.  A "probable-cause hearing focusing on a dog's alert should proceed much like any other," and the relevant inquiry is whether "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 247-48.  Evidence of "a

dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 246.  However, a defendant "must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses." *Id.*  "The defendant, for example, may contest the adequacy of a certification or training program, perhaps asserting that its standards are too lax or its methods faulty." *Id.* at 247.  And even where "a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause, such as if the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id.* (citations and quotations omitted)).

Here, Deputy Donnelly's testimony and the body camera footage establishes that the duration of the traffic stop was limited to the time necessary to process the traffic violation.  The K-9 sniff itself occurred while officers were still completing routine traffic tasks and after officers had already retrieved the firearm from Defendant's person.  There is no evidence that the officers delayed or unlawfully prolonged the traffic stop.  *See Braddy*, 11 F.4th at 1312 (finding no unreasonable delay where "[p]rior to the sniff, no additional time was added to the traffic stop other than necessary for conducting the routine records check necessary for the issuance of and preparation of a traffic citation").  Under the circumstances, the timing of the K-9 deployment does not, standing alone, render the search unlawful.

The constitutional problem arises from the lack of evidence to establish that the K-9 reliably alerted in a manner sufficient to create probable cause.  As discussed above, a warrantless vehicle search based on a K-9 sniff is lawful only if the government proves that a trained dog gave a reliable alert.  Here, the only testimony suggesting an alert came not from the K-9 handler, but from the searching officer, who testified that he overheard the handler say, "you're good," and

interpreted that phrase to mean he could search the vehicle.  The ambiguous statement, without more, is not a description of a trained final response, nor does it establish that the dog alerted.

While the Government provided the body-worn camera footage of the K-9 officer, a review of that footage depicts a brief sniff around Defendant's car lasting less than thirty seconds preceded by the handler's comment "let's go find dope" and ending with the handler commenting "you're good."  *See* Govt. Ex. 5 at 2:00–2:19.  "You're good" is ambiguous phrasing that could have several different meanings.  For example, it could mean no drugs or weapons found, that the dog was good, or go ahead and search.  The footage does not clearly show any objective alert behavior, other than the dog jumping up on the front and back windows, and the Government offered no testimony from the handler identifying this behavior to be the dog's trained final response; whether such response was tied to drugs, firearms, or both; or otherwise confirming that a positive alert occurred.  Under the totality of the circumstances, the Government has not met its burden to show that a reliable alert provided probable cause to search the vehicle.[5]  *See Harris*, 568 U.S. at 246-47.  This case stands in contrast to others like it where the Government has introduced relevant evidence to demonstrate the reliability of a K-9 alert.  *See, e.g., United States v. Acevedo*, 2024 WL 3694470, at *5 (S.D. Fla. June 28, 2024), *report and recommendation adopted*, 2024 WL 3424720 (S.D. Fla. July 16, 2024) (finding K-9 Loki's alert for drugs reliably indicated the presence of drugs within a car and justified a warrantless search based on the testimony of K-9

---

[5] In its responsive brief, the Government invokes the automobile exception.  That doctrine permits a warrantless vehicle search only where officers have probable cause to believe the vehicle contains contraband.  *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999) (reaffirming that the Fourth Amendment permits police searches if a car is ready mobile and probable cause exists to believe it contains contraband).  Because I do not find a reliable canine alert, and thus no probable cause, the automobile exception does not apply.  Additionally, to the extent the Government contends that the calculus changes because Defendant was under arrest after the firearm was found on his person, a lawful arrest does not, by itself, justify a warrantless vehicle search. The search here does not qualify as one incident to arrest under *Arizona v. Gant*, 556 U.S. 332, 351 (2009), which permits a vehicle search only when the arrestee is unsecured and within reaching distance of the vehicle, or when it is reasonable to believe the vehicle contains evidence of the offense of arrest.  Such circumstances are not present here where Defendant was secured in handcuffs and away from the car, and officers had already recovered the firearm from his person.

officer and documents establishing Loki's completion of law enforcement training and certification). Where video evidence fails to sufficiently demonstrate a positive alert and the only supporting testimony is an officer's interpretation of an ambiguous phrase, the search cannot be justified.

Accordingly, although the K-9 sniff itself did not unlawfully prolong the stop, there was no proven alert and so the subsequent warrantless search of the vehicle was unsupported by probable cause. Any evidence recovered from the search of the car should thus be suppressed.

### 4. Defendant's Statements to Police Should Not Be Suppressed

Defendant argues next that his statement admitting he had a weapon and related collection of evidence must be suppressed because police questioned Defendant regarding weapons without *Miranda* warnings in violation of his Fifth Amendment rights. I disagree.

"The Fifth Amendment provides to every person a right against self-incrimination, U.S. Const. amend. V, and, correspondingly, requires that trial courts exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *U.S. v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). As explained by the Supreme Court, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Importantly, the right to *Miranda* warnings attaches only when custodial interrogation begins, meaning questioning after a formal arrest or restraint on freedom of movement to a "degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (citation omitted); *United States v. Brown,* 441 F.3d 1330, 1347-49 (11th Cir.2006). Unlike prolonged stationhouse interrogations, the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the

purposes of *Miranda*." *Berkemer*, 468 U.S. at 440 (roadside questioning of motorist detained for routine traffic stop was not "custodial interrogation" for purposes of *Miranda*, such that motorist's prearrest statements in response to such questioning were admissible).

The Eleventh Circuit has applied this *Berkemer* principle, holding that a person temporarily detained during a traffic stop is ordinarily not in custody for *Miranda* purposes. *See, e.g., United States v. Acosta*, 363 F.3d 1141, 1148-50 (11th Cir. 2004) (explaining that the custody inquiry focuses on whether a reasonable person would feel a restraint comparable to formal arrest); *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (holding that a suspect was not in custody during an on-scene detention where questioning was brief and investigatory in nature).  Whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave."  *United States v. McDowell,* 250 F.3d 1354, 1362 (11th Cir. 2001).  "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  *United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir. 1996).  In applying this objective test, courts consider several factors, including whether "the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."  *United States v. Long,* 866 F.2d 402, 405 (11th Cir.1989).  It is a totality of the circumstances determination.  *Brown,* 441 F.3d at 1347, 1349.

Here, Defendant's admission to possessing a firearm was not obtained in violation of *Miranda* because he was not in custody when the question was asked. Defendant was lawfully stopped for a suspected traffic violation and remained mostly compliant throughout the encounter.  He was asked to exit his car—a routine and permissible step during a

traffic stop—and, within a matter of seconds, the officer asked whether he possessed any weapons. Defendant immediately acknowledged that he had a firearm, and an officer recovered it.  At the time of the officer's question, Defendant was not yet in handcuffs, placed in a patrol car, or otherwise subjected to restraints comparable to formal arrest.  The prearrest encounter remained a brief, on-scene traffic stop, not custodial interrogation.  Under the totality of the circumstances, a reasonable person in the Defendant's position would not have believed he was under formal arrest. Accordingly, *Miranda* warnings were not required.

Alternatively, even assuming a finding of custodial interrogation in these circumstances, the officer's question falls within the public-safety exception to *Miranda*.  Under *New York v. Quarles*, 467 U.S. 649, 655-59 (1984), officers may ask questions reasonably prompted by a concern for officer or public safety without first administering *Miranda* warnings.  The Eleventh Circuit has applied this exception where officers ask limited questions about the presence of weapons during an investigatory detention.  *See United States v. Newsome*, 475 F.3d 1221, 1224-25 (11th Cir. 2007) (applying public safety exception to find defendant's statements admissible where officers had entered motel room, knew they were dealing with a possibly armed felon, and asked question to locate gun during an established "very rapid sequence of events").

Here, the officer's single, immediate question about whether the defendant possessed any weapons could be fairly viewed as motivated by officer-safety concerns during a neighborhood traffic stop.  Because the question was narrowly tailored to secure the scene and protect the officers, the defendant's response is independently admissible under the public-safety exception.

For the above reasons, Defendant's pre-arrest statements to police are not subject to suppression under the Fifth Amendment.

**5.      Good Faith Exception**

Finally, the Government invokes the good faith exception to the exclusionary rule as to all grounds raised in the motion to suppress.  Based on my conclusion that suppression is warranted only with respect to the warrantless search of Defendant's car, my good faith analysis is directed to only that search.

The exclusionary rule generally requires suppression of evidence obtained in violation of the Fourth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961).  This rule is not "a personal constitutional right," but rather a "judicially created" remedy, whose purpose is to "deter future Fourth Amendment violations" and "compel respect for the constitutional guaranty." *Davis v. United States*, 564 U.S. 229, 236-37 (2011) (citation omitted).

The Supreme Court has recognized a limited good-faith exception to the exclusionary rule, described as "a judicially created exception to this judicially created rule[,]" *Davis*,  564 U.S. at 248, where officers act with an objectively reasonable belief that their conduct is lawful.  *United States v. Leon*, 468 U.S. 897, 922 (1984).  The exception applies when suppression would not meaningfully deter police misconduct, such as when officers rely in good faith on a facially valid warrant, binding appellate precedent, or certain statutes later declared unconstitutional.  *Leon*, 468 U.S. at 922; *Davis v. United States*, 564 U.S. 229, 239-41 (2011); *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987); *United States v. Taylor*, 935 F.3d 1279, 1289 (11th Cir. 2019), *as corrected* (Sept. 4, 2019).  The Supreme Court has emphasized that the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring v. United States*, 555 U.S. 135, 145 (2009).  (quoting *Leon*, 468 U.S. at 922 n. 23).

Here, the Government has not shown that the officers acted in objectively reasonable reliance on a warrant, a statute, or binding appellate precedent authorizing the search at issue. This case does not involve a defective warrant, reliance on a statute later declared unconstitutional, or adherence to then-binding precedent. Instead, the officers conducted a warrantless search of Defendant's car without probable cause or an exception to the warrant requirement. Where officers rely only on their own assessment of the legality of a warrantless search, the good-faith exception does not apply. *See United States v. Chanthasouxat*, 342 F.3d 1271, 1279–80 (11th Cir. 2003) (declining to apply good-faith exception where officer conducted traffic stop based on mistake of law that was "reasonable under the circumstances" but was not supported by binding precedent). Because the search here was unsupported by a warrant, statute, or binding precedent, and because the officers were not acting in objectively reasonable reliance on any external legal authority, the good-faith exception does not excuse the constitutional violation. Suppression therefore remains the appropriate remedy under the Fourth Amendment for the invalid warrantless search of Defendant's car.

## RECOMMENDATION

Based on the foregoing, I conclude that the initial traffic stop was supported by probable cause and did not violate the Fourth Amendment. Likewise, the ensuing detention and search of Defendant, including the recovery of the firearm from his person, was legally permissible. The K-9 sniff did not impermissibly prolong the stop, however the Government has not established a valid positive K-9 alert. Without a proven alert, the warrantless search of the car was unsupported by probable cause and was therefore invalid. Accordingly, I respectfully recommend that the motion to suppress, DE 20, be **GRANTED IN PART AND DENIED IN PART**. The motion should be

granted only as to the evidence recovered from the warrantless search of Defendant's car, and denied in all other respects.

### NOTICE OF RIGHT TO OBJECT
### AND SHORTENED OBJECTIONS PERIOD

In light of the swiftly-approaching trial date, I find it necessary and appropriate to shorten the time for any objections pursuant to Southern District of Florida Magistrate Judge Rule 4(a). Accordingly, the parties shall have **FIVE (5) CALENDAR DAYS** from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District Judge Aileen M. Cannon.  *See* 28 U.S.C. § 636(b)(1)(C); S.D. Fla. Mag. J. R. 4(a).  Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).  **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within THREE (3) DAYS of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 13th day of February, 2026.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE